UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONWIDE AGRIBUSINESS INSURANCE; and NATIONWIDE MUTUAL INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>GEORGE PERRY & SONS, INC.; and PAUL GOMES,<br><br>Defendants. | No. 2:17-cv-01910-KJM-CKD<br><br>ORDER |
| UNIGARD INSURANCE COMPANY and ONE BEACON INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>GEORGE PERRY & SONS, INC., a California Corporation, GARY MATTES, individually and dba GARY'S APIARIES and DOES 1 through 20, inclusive,<br><br>Defendants. | No. 2:18-cv-0188-KJM-CKD<br><br>ORDER |

Plaintiffs in the above, related cases are insurance companies. Defendants include a commercial farming company, George Perry & Sons, Inc. (Perry); Perry's Vice President of Operations and farm manager, Paul Gomes; and Gary Mattes both individually and doing

1

business as Gary's Apiaries (collectively, Mattes), a beekeeping business.  Plaintiffs sue for a judicial determination that they owe no duty to defend or indemnify Perry and Gomes under the insurance policies issued to Perry with respect to Mattes's state court lawsuit against Perry and Gomes for alleged destruction of Mattes's beehives while the beehives were on Perry's property. *See* Nationwide[1] Compl. at 1-2, ECF No. 1; Unigard Compl. ¶ 1, ECF No. 1.  Unigard plaintiffs also seek reimbursement from Perry of all attorney's fees and costs the Unigard plaintiffs have advanced to defend the lawsuit.  Unigard Compl. ¶ 1.

Plaintiffs have moved for summary judgment.  Nationwide Mot., ECF No. 11; Unigard Mot., ECF No. 20.  Defendants have opposed.  Nationwide Opp'n, ECF No. 36; Unigard Opp'n, ECF No. 27.  Plaintiffs have replied.  Nationwide Reply, ECF No. 42; Unigard Reply, ECF No. 36.  Plaintiffs contend both a rented (or loaned) property exclusion and a care, custody or control exclusion in their insurance policies with Perry apply as a matter of law, meaning plaintiffs have no duty to indemnify Perry or Gomes with respect to the Mattes lawsuit.  *See* Nationwide Mot. at 4-9; Unigard Mot. at 6-11.  Defendants contend genuine disputes of material fact exist that preclude determining the agreement between Mattes and Perry was a contract to rent property, not a services contract.  Nationwide Opp'n at 7-10; Unigard Opp'n at 7-12.  Defendants also dispute plaintiffs' contention that Perry had exclusive care, custody or control of the beehives.  Nationwide Opp'n at 10-14; Unigard Opp'n at 13-15.

As explained below, the court finds genuine disputes of material fact preclude finding as a matter of law that the rented or loaned property exclusion or the care, custody or control exclusion apply.  The court therefore DENIES summary judgment to plaintiffs.

I. <u>BACKGROUND</u>

In addition to evidence submitted by the parties and documents the court judicially notices, the court draws the following facts primarily from the following documents, whose

---

[1] "Nationwide" as used here identifies documents on the docket or the plaintiffs in *Nationwide Agribusiness Insurance et al v. George Perry & Sons, Inc. et al*, No. 2:17-cv-01910-KJM-CKD.  "Unigard" identifies documents on the docket or the plaintiffs in *Unigard Ins. Co. et al v. George Perry and Sons, Inc. et al*, No. 2:18-cv-00188-KJM-CKD.

2

existence and content are undisputed unless otherwise noted: Nationwide plaintiffs' Statement of Undisputed Facts (NSUF), Nationwide ECF No. 11-2; defendants' Response to Nationwide plaintiffs' Statement of Undisputed Facts (NRSUF) and Statement of Disputed Facts (NSDF), Nationwide ECF No. 36-1; Unigard plaintiffs' Statement of Undisputed Facts (USUF), Unigard ECF No. 22; defendants' response to Unigard plaintiffs' Statement of Undisputed Facts (URSUF) and Statement of Disputed Facts (USDF), ECF No. 27-1; and Unigard plaintiffs' Reply to defendants' response, Unigard ECF No. 36-1.

Nationwide plaintiffs issued multiple insurance policies to Perry between 2012 to 2016. NSUF Nos. 20-26. These policies provided, in relevant part, that Nationwide will "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." NSUF No. 28. The policies included exceptions for any property the insured rents. NSUF Nos. 30-31, 36, 38. Additionally, the policies excluded property damage for "[p]ersonal property in the care, custody or control of the insured." NSUF Nos. 33, 36, 40.

Unigard plaintiffs also issued multiple insurance policies to Perry, between 2010 and 2012. USUF No. 24. These policies provided that the insured "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' . . . ." USUF No. 25. Similar to the Nationwide plaintiffs' insurance policies, the Unigard plaintiffs' insurance policies contained exceptions for property Perry rented, property loaned to Perry, or "[p]ersonal property in the care custody or control of the 'insured' . . . ." USUF No. 26.

In 2013, Mattes sued Perry and Gomes for negligence, negligence per se, intentional misrepresentation and concealment, and negligent misrepresentation and negligent concealment relating to the mass death of Mattes's pollinating bees on farm property owned by Perry. Nationwide ECF No. 12-1[2]; NSUF No. 1. Mattes later filed an amended complaint

---

[2] The court judicially notices the existence of this complaint as a fact that "can be accurately and readily determined by trial courts from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The complaint is a matter of public record. *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988). Courts may judicially notice facts of public record in a judicial or administrative proceeding that "direct[ly] relat[e] to the matters at issue," such as the existence of a motion or of representations made therein. *United States v.*

containing the same four claims.  NSUF No. 2; Nationwide ECF No. 12-2.  In the amended complaint, Mattes alleged "Perry's operations included the commercial production of watermelons and pumpkins, for which Perry rented bee hives for pollination from Mattes during 2009, 2010, 2011 and 2012." *Id.* at 3.  Mattes also alleged that "Perry orally contracted with Mattes to provide bee hives to pollinate Perry's crops" from 2009 to 2012. *Id.* at 4.  According to Mattes, Perry's application of various pesticides near the location of Mattes's bees caused "catastrophic losses to his bee hives resulting in more than a 95 percent die off in 2012 alone . . . ." *Id.* at 4-5.

The parties have submitted deposition testimony taken in the Mattes state suit, and agree the court can rely on it here.  Mattes was deposed in February and March of 2015, and Gomes was deposed in June 2016.  Mattes Decl. ¶ 14, Nationwide ECF No. 36-5; Gomes Decl. ¶ 10, Nationwide ECF No. 36-2.  During his first deposition, Mattes stated Gomes first called him in April 2009 "and asked [Mattes] if [Mattes] wanted to do their melons and pumpkins." Mattes Dep. Vol. I at 98:19-22, ECF No. 36-5 Ex. A.  Mattes responded, "Right," when asked if Mattes recalled Gomes's inquiring "if [Mattes was] interested in providing pollination services." *Id.* at 102:8-10; *see also id.* at 117:16-20 (Mattes responding in part ,"Yeah," to a question about providing pollination services to Perry).  Mattes acknowledged that "[p]rice and how many hives they need and when they need them" were the terms typically involved in an oral agreement with farmers for pollination.  *Id.* at 103:14-17.  Before contracting with Perry and Gomes, Mattes had gotten "heavier into feeding" his bees used to pollinate crops, and "[n]ow [they] supplement feed quite a bit." *Id.* at 93:8-21.

According to Mattes, initial hive placement "was always done at night or early morning" and did not involve anyone affiliated with Perry being there during the initial placement. *Id.* at 144:13-15.  It was "[u]sually [Mattes's] decision" to place the bee hives: "They pretty much left it in our hands where to put them."  *Id.* at 145:5-20.  Mattes would check on

*Southern California Edison Co.*, 300 F. Supp. 2d 964, 973 (E.D. Cal. 2004) (quoting *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992)).  But the court may not judicially notice arguments, disputed facts or legal interpretations from those public proceedings. *Id.* at 974.

4

hives at times "with a drive-by" without stopping if "everything look[ed] good." *Id.* at 150:17-21; *see also id.* at 151:7-12 (discussing visual inspections of "[t]he amount of bees going in and out . . . ."). Mattes recalled that "[w]e generally looked at [the hives] once or twice" for Perry's watermelon pollination between the time Mattes dropped off the hives and later picked them up. *Id.* at 150:22-151:2. In 2009, Mattes "did replace some [hives] with nukes," which were smaller versions of normal bee hives. *Id.* at 152:2-7, 153:19-24; *see also* Mattes Decl. ¶ 8 (explaining nukes or "nucs" as smaller versions of normal bee hives). At times, Mattes would be informed that Perry did not "want [Mattes] working any bees while the pickers are out here [in the field] . . . ." *Id.* at 149:12-24. Mattes's hives would remain in Perry's fields for about one month to pollinate pumpkins and "from June through September" to pollinate watermelons. *Id.* 148:18-149:8, 161:14-17. Gomes would call Mattes and tell Mattes "to get [the hives] out." *Id.* at 161:18-24.

Although "[t]he rule is once [Mattes] put [the hives] there, leave them there," Mattes stated "there were times [Mattes] had gone out there and they moved them, which is not a good thing to do." *Id.* at 123:10-21. On these occasions, nobody had advised Mattes that the hives were not in an appropriate location; "they just moved them." *Id.* at 144:20-23.

Mattes also acknowledged non-employee compensation of $27,460 reported on a 2009 IRS 1099 form as corresponding with the amount Mattes charged Perry for pollination services that year. *Id.* at 138:1-11.

During his deposition as the person most knowledgeable for Perry, Gomes testified he would tell a prospective pollinator "[w]e're going to have X amount of acres of watermelons, they will be in these general locations and everything and we will need bees." Gomes Dep. at 56:2-8, Nationwide ECF No. 11-7. Gomes knew "we want[ed] to put a hive or a hive and a half per acre." *Id.* at 56:11-12. Gomes would "let them know" when to bring the bee hives out. *Id.* at 56:12-15. Gomes acknowledged Mattes would invoice Perry, and the invoice would reflect where Gomes told Mattes to put the bees and however many bees Gomes determined were necessary. *Id.* at 58:25-59:3. However, in response to a specific invoice exhibit presented to Gomes at deposition, Gomes stated the only thing that particular invoice "doesn't

show" is whether the "bees that [Mattes] billed me for . . . were his bees or somebody else's bees." *Id.* at 59:4-9. Gomes stated if Mattes did not have enough bees, Mattes would rent bees from somebody else. *Id.* at 59:10-12.

Gomes would check to ensure the hives were where Gomes told Mattes to put them. *Id.* at 78:21-79:1, 94:23-95:2. According to Gomes, beekeepers are "not going into the field" within 24 hours of pesticide application; they would go "[a]round the field" or in a buffer zone, but not into the field itself. *Id.* at 130:18-132:8.

For these motions, no party disputes Mattes's allegation that Perry applied pesticides to its fields while Mattes's bees were pollinating those fields, the applied pesticides were toxic to the bees, and as a result of the pesticide exposure over a four-year period, the bee hives suffered a catastrophic loss of bees. NRSUF Nos. 16-17.

Mattes, in a declaration submitted in opposition to the pending motions, has stated he maintained access to the bees after placing them near Perry's fields, regularly visiting, inspecting, feeding, medicating and vaccinating the bees. Mattes Decl. ¶¶ 3, 7-9 (explaining he would drop in smaller versions of normal bee hives if bee populations were insufficient and would "requeen" a hive with another queen if needed). Mattes expected Perry would not interact with his bees or their hives and that Perry would not attempt to move them, consistent with Mattes's expectation of all growers who receive his pollination services. *Id.* ¶ 11. According to Mattes, interacting with the hives would create a safety hazard both to farm workers and to the bees. *Id.* Moving the hives and caring for the bees takes special skills, knowledge and equipment. *Id.*

In a declaration submitted in opposition to the motions, Gomes states Perry does not employ a trained beekeeper and has always contracted with beekeepers in the area who keep their own hives. Gomes Decl. ¶ 2. According to Gomes, Perry's personnel stayed away from Mattes's hives when working in Perry's fields. *Id.* ¶ 6. "Perry did not move or relocate Mattes'[s] hives." *Id.*

Although the parties do not dispute a 2009 invoice from Gary's Apiaries referring to the number of bee hives Perry "rented" from Mattes, the parties dispute the meaning of this

6

invoice. NRSUF No. 5. For instance, Mattes's general practice with Perry was to provide one invoice up front and receive payment of that amount, then submit a second invoice for the actual number of hives used during the growing season. Mattes Dep. Vol. I at 135:20-25; *see also* Mattes Decl. ¶ 4 ("I charged Perry for my services on a 'per hive' basis. . . . consistent with how I charged other local growers.").

In motions *in limine* filed in the Mattes state suit, Perry and Gomes repeatedly refer to Mattes as owning "a bee business in which he rents bee hives to local farmers" and represent that Perry "rented bee hives from Mattes from 2009 to 2012." *E.g.*, Nationwide ECF No. 35-1 at 3, 6, 9.[3]

Perry has submitted the declarations of Todd Garibaldi, a licensed insurance broker, and Charleen Carroll, owner of Pollination Contracting Inc. *See* Garibaldi Decl., Nationwide ECF No. 36-3; Carroll Decl., Nationwide 36-4. Garibaldi refers to his experience of "farming for over 30 years," having "retained the pollination services of many different beekeepers" and being "familiar with the general practices of farmers and beekeepers in arranging for pollination services." Garibaldi Decl. ¶ 2. Garibaldi asserts he "require[s], and the beekeeper insists, that the beekeeper remain in control of his or her bees and hives while providing the pollination services that [Garibaldi's] crops need." *Id.* ¶ 3. The beekeepers Garibaldi hires are "responsible for inspecting, feeding, medicating, and providing any other care that the bees or hives require." *Id.* ¶ 4.

In her declaration, Carroll indicates she is the owner of a company that, since 1978, has "connect[ed] beekeepers and growers, primarily almond growers, for pollination services." Carroll Decl. ¶ 1. Carroll provided testimony in the Mattes suit, including "opinions related to the almond market, pollination services in general, and [her] experience working with

---

[3] The court judicially notices the existence of these statements as facts that "can be accurately and readily determined by trial courts from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). These motions, filed in the Superior Court of the State of California, are a matter of public record. *See Emrich*, 846 F.2d at 1198; *Southern California Edison Co.*, 300 F. Supp. 2d at 973-74. But the court may not judicially notice mere arguments, disputed facts or legal interpretations from those public proceedings. *Id.* at 974.

Mr. Mattes." *Id.* ¶ 3. Carroll states "growers and beekeepers use the terms 'hive rental' and 'pollination services' interchangeably." *Id.* ¶ 6. Carroll also states beekeeping "requires very specialized skills," and the contracts her company "has been involved with over the last forty years" contain "provisions that the beekeeper will always have access to his or her hives while the hives are present in the grower's fields, the grower shall not move the hives without express permission from the beekeeper, and the grower shall be penalized . . . if any hive is moved without permission from the beekeeper." *Id.* ¶ 11.

II. <u>LEGAL STANDARD</u>

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Then the burden shifts to the non-movant to show "there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record" or "or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B); *see also Matsushita*, 475 U.S. at 586 ("[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts"). Also, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48.

In deciding summary judgment, the court draws all inferences and views all evidence in the light most favorable to the non-movant. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant], there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First*

8

*Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). The Supreme Court has taken care to note that district courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial," *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)), "even in the absence of a factual dispute," *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572).

III. DISCUSSION

    A. Rented Property or Services Contract

Plaintiffs contend the rented (or loaned) property exclusion in their insurance policies with Perry apply as a matter of law, meaning plaintiffs have no duty to indemnify Perry or Gomes with respect to the Mattes lawsuit against them. *See* Nationwide Mot. at 4-7; Unigard Mot. at 6-8. Defendants contend genuine disputes of material fact exist that preclude determining the agreement between Mattes and Perry was a contract to rent property, not a services contract. Nationwide Opp'n at 7-10; Unigard Opp'n at 7-12. The court agrees with defendants.

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. Although contract interpretation can at times be a matter of law for the court, it is a question of fact for the jury if ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence. *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008). "The objective intent" of the contract is controlling. *Lloyd's Underwriters v. Craig & Rush, Inc.*, 26 Cal. App. 4th 1194, 1197-98 (1994). The "intention of the parties must be ascertained from consideration of the entire contract, not some isolated portion." *Cty. of Marin v. Assessment Appeals Bd. of Marin Cty.*, 64 Cal. App. 3d 319, 324-25 (1976) (emphasis removed, citations omitted).

No party disputes that the contract between Perry and Mattes was an oral contract. The Nationwide and Unigard plaintiffs focus on two slim reeds: one, a single passing reference to renting bee hives in Mattes's first amended complaint, specifically a reference to bee hives "rented" in a 2009 invoice, and two, the cursory references to Perry's renting bee hives as part of a brief factual summary included in motions *in limine* drafted by attorneys funded by plaintiffs. The latter motions do not turn on whether the contract is a rental contract or a services contract. Plaintiffs argue these items permit this court to rule that no reasonable factfinder could conclude Perry and Mattes had a contract for pollination services because these items constitute judicial admissions. Nationwide Reply at 6. Judicial admissions, which generally "are formal admissions in the pleadings," withdraw "a fact from issue and dispens[e] wholly with the need for proof of the fact." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (citation omitted). And "statements of fact contained in a brief may be considered admissions of the party in the discretion of the district court." *Id.* at 227 (emphasis omitted). But here, plaintiffs ask the court to make the inferential leap to a legal conclusion, not to bind Mattes to having "rented" bee hives in 2009. Moreover, the court has discretion to decide if statements in a brief are admissions, *see id.*, and the court declines to exercise that discretion to characterize as judicial admissions the cursory references to renting bee hives in short factual summaries of motions *in limine*. The court instead applies all facts before it to the summary judgment standard, below.

The court cannot find on the record before it, as a matter of law, that the contract between Perry and Mattes was a rental contract. Plaintiffs' arguments ignore the multiple references to pollination services throughout the Mattes deposition, which reveal both the lack of concern about the contract's status as a rental or services contract and a genuine dispute of material fact precluding summary judgment on this issue. *See, e.g.*, Mattes Dep. Vol. I at 102:8-10, 117:16-20. Additionally, Gomes testified at deposition that a "memorializer" of the agreement between Perry and Mattes would show if the bees Mattes billed Perry for "were his bees or somebody else's bees," acknowledging that Mattes would rent bees from someone else if Mattes did not have enough bees. Gomes Dep. at 59:6-12. This deposition testimony, if given

weight, could permit a reasonable juror to conclude that Gomes and Mattes had a services contract, not a rental contract.

Other conflicting evidence supports the existence of a genuine dispute of material fact as to the nature of the agreement between Mattes and Perry. *Compare, e.g.*, Mattes Dep. Vol. I at 138:1-11 (Mattes acknowledging non-employee compensation of $27,460 on a 2009 IRS 1099 form as corresponding with the amount Mattes charged for pollination services that year), *with* NRSUF No. 5 (2009 invoice from Gary's Apiaries, Mattes's beekeeping business, referring to the number of bee hives Perry "rented" from Mattes).

The Carroll and Garibaldi declarations also provide evidence of industry custom related to bee hive pollination agreements, including trade usage of the term "rent." *E.g.*, Carroll Decl. ¶ 6 ("growers and beekeepers use the terms 'hive rental' and 'pollination services' interchangeably"); *id.* ¶¶ 1, 3, 11; Garibaldi Decl. ¶¶ 2-4. This evidence is relevant to contract interpretation under California law. *See Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1357 (2004) ("evidence of industry custom and [trade] usage" "relevant and admissible to expose the latent ambiguity in the contract language regarding the industry's customary usage of the term"); *Heggblade-Marguleas-Tenneco, Inc. v. Sunshine Biscuit, Inc.*, 59 Cal. App. 3d 948, 956 (1976) ("[P]ersons carrying on a particular trade are deemed to be aware of prominent trade customs applicable to their industry."). Although the Unigard plaintiffs object to these declarations as "impermissible lay witness opinion in violation of Federal Rule of Evidence . . . 701," ECF No. 36-2 at 2, the court finds this objection without merit at the summary judgment stage, especially in a case that has been stayed without any new discovery pending the outcome of these motions. *See* Nationwide ECF No. 41; *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir.2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."). Because the contents of the Carroll and Garibaldi declarations could be admissible at trial as expert testimony or as lay opinion, the court

11

finds they support the existence of a genuine dispute of material fact as to the nature of the agreement between Mattes and Perry.

The court's conclusion here is consistent with other cases that have expressly held an insurance property's rented property exclusion did not apply when the property could not be separated concurrent services provided. For example, in *Rice Bros. Inc. v. Glens Falls Indem. Co.*, 121 Cal. App. 2d 206, 208 (1953), the evidence showed that "rented" trucks were operated at all times by drivers employed by the person furnishing the trucks to plaintiff company. Although the plaintiff company was in charge of the work, the person furnishing the trucks could terminate the use of a truck and do anything he wanted with the trucks but would not be paid unless the trucks were working at plaintiff company's job site. *Id.* at 208. The court held the damaged truck was not rented to plaintiff company; thus, the insurance policy's rented property exclusion did not apply. *Id.* at 209. Specifically, "the parties did not intend, and did not give, to [plaintiff company] any possession of the . . . truck, nor any use of that truck apart from the services rendered by the driver and the truck in combination; that [plaintiff company] could not break up this combination and be left with a right either to the possession or the use of the truck." *Id.*

Furthermore, in *Northbrook Excess & Surplus Ins. Co. v. Coastal Rescue Sys. Corp.*, 182 Cal. App. 3d 763, 769 (1986), the California Court of Appeal held an insurance policy rented property exclusion did not apply where the agreement "was that the [rented] helicopter was to be provided with a pilot who had complete control of the aircraft." Specifically, "[t]he parties [t]here could not have intended for [the receiving party] to have possession or use of the helicopter apart from the services rendered by [the pilot] *and* the helicopter, in combination." *Id.* (emphasis in original). The company receiving the helicopter "could not break up the combination and be left with the helicopter." *Id.* As explained above, the evidence before the court discloses a genuine dispute of material fact regarding the nature of the agreement between Mattes and Perry. The court cannot conclude as a matter of law that Perry could have broken up "the combination" of hives and services, keeping only the bee hives, especially in light of Mattes's deposition testimony and declaration indicating his maintenance of the hives. *See, e.g.*, Mattes Dep. Vol. I at 152:2-7, 153:19-24; Mattes Decl. ¶¶ 3, 7-9.

12

B. <u>Judicial Estoppel</u>

The Unigard plaintiffs also contend defendants are judicially estopped from contending Perry did not rent the bee hives. Unigard Mot. at 8-10. Defendants argue Unigard plaintiffs have failed to show the elements required to trigger judicial estoppel are satisfied here. Opp'n at 10-12. As explained below, the court finds judicial estoppel does not apply to defendants' contention that the contract between Perry and Mattes was not one to rent property.

Judicial estoppel "is an equitable doctrine a court may invoke to protect the integrity of the judicial process." *United Nat. Ins. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778 (9th Cir. 2009). This doctrine bars both litigants' inconsistent positions taken in the same litigation and litigants from making incompatible statements in two different cases. *Id.* (citation omitted). The current position must be "clearly inconsistent" with the earlier position. *Id.* (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). The parties both refer to the elements required under California case law for judicial estoppel to apply: (1) the same party has taken two positions; (2) the party took those positions in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position; (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. *Padron v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 16 Cal. App. 5th 1246, 1263–64 (2017) (citing *People v. Castillo*, 49 Cal. 4th 145, 155 (2010)).

The Unigard plaintiffs have not shown Mattes or Perry have taken different positions, much less "totally" or "clearly inconsistent" positions. As noted above, in Mattes's first deposition, he made references to renting and pollination services interchangeably with no indication that he meant different things by using different wording, or that one described the correct legal nature of his agreement with Perry. *See, e.g.*, Mattes Dep. Vol. I at 102:8-10, 117:16-20. Mattes's reference in his amended complaint to Perry's "rent[ing]" bee hives is not fairly read as a legal position or an allegation about the nature of the contract but a passing reference to the relationship between Perry and Mattes, also described as Perry's "orally contract[ing] with Mattes to provide bee hives to pollinate Perry's crops." Nationwide ECF No. 12-2 at 3-4. Moreover, Mattes's use of "rented" in his complaint would not judicially estop

13

Perry from contending the relationship was different. Perry's references to his "rent[ing]" bee hives from Mattes in multiple motions *in limine* in state court, in the introductory sections of those motions, do not indicate a legal position regarding the nature of the contract between Perry and Mattes. *See, e.g.*, Nationwide ECF No. 35-1 at 3, 6, 9.

Even if Perry or Mattes had asserted their agreement legally was a rental contract, the Unigard plaintiffs have not shown how Mattes or Perry have succeeded in advancing the assertion. Even if Perry or Mattes had advanced totally inconsistent positions in their depositions, their deposition testimony contrasts sharply with statements made in the case of *United Nat. Ins.*, 555 F.3d at 778-80, on which Unigard relies. There, a party successfully convinced a previous court not to grant an injunction, and benefitted from arguing that the opposing party's alleged infringement arose from materials first published in 1999. *Id.* at 779. The same party later attempted to argue in a different case that the same infringement did not begin until 2001, which would have permitted the party "the possibility of prevailing on the very position it successfully discredited while attempting to avoid preliminary injunction." *Id.* Unigard plaintiffs do not point to any similar successful argument here.

Finally, the Unigard plaintiffs also have not shown that any purported position taken by Mattes or Perry was deliberate, or that the cursory references to "rented" were not "a result of ignorance, fraud, or mistake." *Padron*, 16 Cal. App. 5th at 1263. Factors also counseling against the application of judicial estoppel include Carroll's statement that "growers and beekeepers use the terms 'hive rental' and 'pollination services' interchangeably," Carroll Decl. ¶ 6, and the drafting of Perry's motions *in limine* in the Mattes state suit by attorneys funded by plaintiffs in this case.

The court declines to apply the equitable doctrine of judicial estoppel.

C. <u>Care, Custody or Control</u>

Plaintiffs also argue the care, custody or control exclusions in their insurance policies preclude plaintiffs' providing coverage in the Mattes suit. Nationwide Mot. at 7-9; Unigard Mot. at 10-11. They say Mattes maintained care, custody and control of his bees while they pollinated Perry's crops, pointing not only to the evidence before the court but also to a

14

1  California regulatory scheme as evidence that beekeepers, not property owners, maintain care,
2  custody and control of pollinating bees. Nationwide Opp'n at 10-14; Unigard Opp'n at 13-15.
3  As explained below, the court finds a genuine dispute of material fact sufficient to deny summary
4  judgment to plaintiffs here as well.

5  This case is analogous to that of *Home Indem. Co. v. Leo L. Davis, Inc.*, 79 Cal.
6  App. 3d 863 (1978). There, defendant had been sued in another case for damage stemming from
7  the use of a crane defendant owned. *Id.* at 866. Plaintiff insurance company contended that, at
8  the time of the damage, the damaged property was under the "care, custody or control" of
9  defendant. *Id.* But the testimony of defendant's crane operator was that he could not see the end
10 of the crane boom and hook and was "working completely blind, acting solely upon the directions
11 issued by" another company working with defendant. *Id.* at 867. The California Court of Appeal
12 examined several cases in similar contexts, observing "[t]he factor relied upon most heavily" by
13 courts holding the care, custody or control exclusion inapplicable was "that control was
14 effectively retained in some fashion by the owner of the damaged property or by his employees
15 during the time that the contractor was doing whatever he was to do to or with the damaged
16 property." *Id.* at 869. In contrast, "in California cases that have applied the exclusion to defeat
17 coverage, contractual responsibility for the entire operation rested with the insured." *Id.* The
18 court continued, observing "[a]lmost invariably where coverage is denied, physical control by the
19 insured has been exclusive, even if such exclusivity was only momentary, so long as the damage
20 occurred in that moment." *Id.* at 871. The court also identified another approach by courts
21 "where the exclusion has been held inapplicable [when] view[ing] the insured as having been
22 given merely temporary access to the damaged property." *Id.* Regardless, the court maintained
23 "the need for painstaking evaluation of the specific facts of each case, especially those that bear
24 on the nature and extent of the insured's control." *Id.* at 871-72. The court observed defendant's
25 control "was not exclusive at the time of the accident"; the other companies involved
26 "temporarily shared with [defendant] their control." *Id.* at 872. The defendant therefore was
27 "provided the insurance coverage which under the evidence he intended to purchase and believed
28 he had." *Id.*

Here, genuine disputes of material fact preclude a finding that Perry exercised "exclusive and complete" control of the bee hives at the time the hives allegedly suffered damage from Perry's pesticides. *See Home Indemn. Co.*, 79 Cal. App. 3d at 872. Mattes engaged in supplemental feeding of his bees and maintenance of the bee hives, including providing supplemental "nukes" or "nucs" and re-queening hives as needed. Mattes Dep. Vol. I at 93:8-21; Mattes Decl. ¶¶ 3, 7-9. Mattes placed the hives without Perry's presence. Mattes Dep. Vol. I at 144:13-15. It was "[u]sually [Mattes's] decision" as to how to place the bee hives; "They pretty much left it in our hands where to put them." *Id.* at 145:5-20. In 2009, Mattes "did replace some [hives] with nukes." *Id.* at 152:2-7, 153:19-24

Although Mattes stated in his deposition that others had moved his hives, "[t]he rule is once [Mattes] put [the hives] there, leave them there." *Id.* at 123:10-21. Gomes also stated Perry personnel stayed away from Mattes's hives when they were working in Perry's fields. Gomes Decl. ¶ 6. Further, Gomes stated Perry does not employ a trained beekeeper and has always contracted with beekeepers in the area who keep their own hives. *Id.* ¶ 2. To the extent maintenance of bee hives "requires very specialized skills," *see* Carroll Decl. ¶ 11, and Perry's personnel did not actually move the hives, the court cannot rule as a matter of law that Perry exercised exclusive and complete control of the bee hives without employing its own beekeeper. *See Essex Ins. Co. v. Soy City Sock Co.*, 503 F. Supp. 2d 1068, 1075 (C.D. Ill. 2007) ("The inquiry also involves a consideration of who 'exercised the right of access to . . . maintain, move, or protect' the property.") (citing *Bolanowski v. McKinney*, 581 N.E.2d 345, 349 (Ill. App. Ct. 1991).

Plaintiffs direct the court's attention to Perry's not "want[ing] [Mattes's] working any bees while the pickers are out here [in the field] . . . ." Mattes Dep. Vol. I at 149:12-24. Additionally, Gomes testified at deposition that beekeepers would not go "into the field" within 24 hours of pesticide application; they would go "[a]round the field" or in a buffer zone, but not into the field itself. Gomes Dep. at 130:18-132:8. Although this testimony suggests Mattes might not have had exclusive control of the bee hives during pesticide application, the court still finds a genuine dispute of material fact as to the "nature and extent" of Perry's control—the

1 "insured's control"—during pesticide application. *See Home Indemn. Co.*, 79 Cal. App. 3d at 872.

Additionally, the timing and duration of the harm inflicted on the bee populations here is not clear. Mattes alleges the harm caused to his bees occurred as a result of pesticide exposure over a four-year period. NRSUF Nos. 16-17. The court finds a genuine dispute of material fact remains as to the nature and extent of Perry's control across that four-year period. Even if Mattes did not retain complete and exclusive control over the bee hives during this four-year period, a reasonable juror could conclude that at all times, even during pesticide spraying, Mattes and Perry exercised "shared" control of the bee hives in light of the prohibition against Perry's moving the hives. *See Home Indem. Co.*, 79 Cal. App. 3d at 872; *see also Silva & Hill Constr. Co. v. Employers Mut. Liab. Ins. Co.*, 19 Cal. App. 3d 914, 924 (1971) (finding a road was within the care, custody or control of plaintiff at the time of the accident in part because "[t]he state's contract expressly provided that plaintiff would at all times prior to completion of the project retain ultimate responsibility over the work of its subcontractors").

This case differs substantially from *Karpe v. Great Am. Indem. Co.*, 190 Cal. App. 2d 226, 228 (1961), which the court discussed with counsel at hearing. In *Karpe*, one party left a cow at plaintiff's ranch for breeding purposes. *Id.* Plaintiff mistook the cow as one of his own cows and sent her to a slaughterhouse, where the cow was destroyed. *Id.* The court found a "care, custody or control" exclusion applied to prevent plaintiff from being indemnified by his insurance for damages from his sending the cow to slaughter. *Id.* at 233. The court did not observe any facts indicating a specialized knowledge needed for plaintiff to know the cow was not his, nor did the court observe any facts indicating the owner of the cow had exercised any control over the cow after leaving the cow at plaintiff's ranch.

As noted, defendants also direct the court's attention to a California regulatory scheme that requires advising beekeepers, not the owners of property where bee hives are located, of pesticide application "at least 48 hours in advance of the application." Cal. Code Regs., tit. 3 § 6654(b); *see* Nationwide Opp'n at 11-12; Unigard Opp'n at 14-15. Although this regulatory scheme does not prove the details of Mattes's and Perry's agreement or conduct, it casts further

17

doubt on plaintiffs' assertion that Perry exercised exclusive control at least during pesticide applications. This doubt is sufficient to contribute to a genuine dispute of material fact as to the nature and extent of Perry's control during pesticide application.

At hearing, plaintiffs asserted Perry would not know the exact time of application when it relied on others to apply pesticides as support for their position that Mattes lacked exclusive control over the bee hives. In any event, the record does not support the assertion. *See* NSDF 7; Gomes Decl. ¶ 9 ("When Perry applied pesticides itself, it did so by injecting the pesticides into Perry's underground irrigation system (this is called chemigation). Perry retained the services of licensed, third-party pesticide applicators (independent contractors) to perform aerial and ground applications of pesticides on Perry's crops."); *see also* URSUF 17, 20 (though disputed for other reasons, noting allegation that "Perry applied pesticides"). Moreover, Gomes testified at deposition that Perry alerts its employees when pesticide application is going to occur, after testifying about ground application contractors, in-house chemigation and contractors for aerial application. Gomes Dep. (Unigard excerpts) at 50:25-53:17, ECF No. 24-1 at 5. The summary judgment record thus does not clearly indicate Perry did not know precise application times of applications by independent contractors. To the extent Perry did lack knowledge, this too contributes to a genuine dispute of material fact regarding Perry's "exclusive and complete" control across that four-year period. *See Home Indemnity Co.*, 79 Cal. App. 3d at 871-72.

D. Self-Serving Declaration

Nationwide plaintiffs assert "the Court need not consider Gomes's self-serving and inconsistent declaration." Nationwide Reply at 7. As the Ninth Circuit has observed, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citation omitted). This "sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id.* (citation and internal quotation marks omitted). To trigger the sham affidavit rule, "the district court must make a factual determination that the contradiction is a sham, and the 'inconsistency between a

party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" *Id.* (citation omitted).

The court observes no clear and unambiguous inconsistency here. Although Gomes states in his declaration that he "relied upon Mattes to determine where to place his hives near Perry's crops so that the bees will work Perry's field and pollinate its crops," Gomes Decl. ¶ 5, Gomes's deposition testimony that he would provide "general locations" for the bee hives and would check to ensure the hives were placed where Gomes indicated is not clearly inconsistent with a later declaration that Gomes relied on Mattes for placement sufficient to pollinate the crops. *See* Gomes Dep. at 56:2-8, 78:21-79:1, 94:23-95:2. Gomes's declaration that "Perry did not move or relocate Mattes'[s] hives," Gomes Decl. ¶ 6, merely reveals a difference in perceptions from Mattes's deposition testimony, testimony which itself did not report direct observation of Perry's moving the hives. *See* Mattes Dep. Vol. I at 123:10-21, 144:20-23. These different observations by likely trial witnesses call for a credibility determination that is the sole province of the jury. The court declines to strike the Gomes declaration.

IV. <u>CONCLUSION</u>

Nationwide plaintiffs' motion for summary judgment, ECF No. 11, is DENIED. Unigard plaintiffs' motion for summary judgment, ECF No. 20, is DENIED.

IT IS SO ORDERED.

DATED: September 3, 2018.

_____
UNITED STATES DISTRICT JUDGE